Ron, in this case on the document 2-17-0621, in marriage now to Stacey Goodman, Petitioner, Appellant, and Cross-Appellee, and Drew Goodman, Respondent, Appellee, Cross-Appellant. Arguing on behalf of the Intervenor Appellant, Ms. Valerie J. Quinn. Arguing on behalf of the Petitioner Appellant, Cross-Appellee, Mr. David I. Runn. Arguing on behalf of the Respondent, Appellee, Cross-Appellant, Mr. Michael G. Domenico. Thank you. Ms. Quinn. May it please the Court. ISP is here on a narrow issue of statutory construction. Could you speak up a little louder, please? I will. The Illinois State Police is here on a very narrow issue of statutory construction, Your Honor. Section 8.2 of the FOID Act requires the State Police to revoke the FOID card of anyone who is subject to an existing order of protection. Its language is plain and unambiguous and must be interpreted as written. Does that then mean that the agents that were surveilling the wife should also have their FOID cards suspended until such time as the order of protection is terminated? The order of protection was entered against Drew Goodman, so it is Drew Goodman's FOID card. I thought it was also against his agents, was it not? Maybe I misunderstood. No, the revocation was Drew Goodman's FOID card that was revoked as a result of the agreed interim order and then the plenary order. Didn't the order include his agents? I mean, it was agents, not him, that was doing this, was it not? The order was directed against him, Your Honor. He was a FOID card holder. I do not know whether the private investigators who were surveilling Stacy had their FOID cards revoked. I do know that Drew's FOID card was revoked, and it is that issue upon which we took this appeal. Let me get you sidetracked further, but let me ask a threshold question. Did the Department ever appeal the order dismissing for lack of jurisdiction? No, it did not, Your Honor. Is there a question on the propriety of when you intervened and your right to intervene? What's your position on that? There should not be, Your Honor, because this Court granted our motion to intervene and did not put any restrictions on it, and the intervention statute states that once intervention is granted, the intervener has all the rights of an original party. As this Court has noted, the purpose of legislative history is to resolve ambiguities, not to create them. So while it should have been unnecessary to delve into the history of this provision and its relationship to the statutes providing for orders of protection, it is plain from a reading of those statutes as a whole. But the General Assembly has created a harmonious body of law to address its reasonable concern for public safety and its determination that people who are subject to domestic violence protection orders pose an increased risk of safety to their partners and children. In all instances where there is an order of protection against an individual, the state police must revoke the respondent's card. That's revocation. Seizure, which can occur pursuant to order of the circuit court, is another matter. ISP does not seize cards or guns. No, you don't look behind. The Department does not look behind the order to determine the strength of the evidence or anything like that. Is that correct? No, we are not here on the merits of whether the order of protection should or should not have entered. Our only concern, Your Honor, is that under Section 8.2, if there's an order of protection, the respondent cannot have a void card. The criminal domestic violence protective order requires the circuit court to order seizure of the respondent's void card and his guns, while the civil domestic violence order of protection statute merely authorizes or allows it. Let me ask this. What is the remedy, then, if somebody believes that the order was entered improperly or improperly? The remedy would go back to the court. There would have to be a motion to vacate the order of protection. You only respond to that. If you receive an order, as you say, you must respond to that. I'm sorry, Your Honor, I didn't process the question. If somebody believes that the order was entered improperly, the remedy, then, would be to go back to the court that entered the order. Is that what you're suggesting? You don't look at the evidence behind the order, correct? We do not look at the evidence behind the order. If Mr. Goodman thought that the order was entered improperly against him, he had the option of appealing to the state police. Well, isn't that somewhat of a hollow option? It would be. Well, then, what's the point? The question was, what's his remedy? You've suggested there is no remedy. To the extent that he wished to raise constitutional questions, as he has attempted to do in the first instance on appeal, there were two avenues. Nonetheless, he has no remedy with the state. Your position is, it's issued, his void card is revoked. He has no avenue to challenge whether or not the order of protection was properly entered. Is that correct? That he should challenge that in the circuit court, Your Honor, with the state police or the circuit court. He could bring an action in the circuit court. But in the meantime, your position is he has no void card. He has no void card. That is correct. So then there is no remedy. He has no void card. We are required to revoke under Section 8.2. Let's assume that instead of surveilling his ex-wife, that he texted her 500 times in an hour and an order of protection was entered against him for texting her. And as I understand your argument, the void card would be required to be suspended or at least taken into custody by the state police until such time as the order of protection was terminated. What happens is the circuit court clerk transmits information to local law enforcement. Local law enforcement notifies ISP. This is in the normal course. A seizure has not been ordered. So what I'm getting at is normally I can understand the reasonable exercise of the police power to limit possession relative to firearms to people who may or may not be violent or at least show a tendency toward violence. And as I understand it, you're telling me that ipso facto or it is presumed that somebody who text messages somebody to the point of harassment will lose their void card upon the entry of an order of protection relative thereto because that's how the state police interpret the statute. That is what the General Assembly, Your Honor, has reasonably determined that people who are subject to orders of protection pose an increased risk. And the General Assembly has created a narrow class of persons who are qualified to receive a second amendment right for the duration of that order. An increased risk of what? An increased risk to the safety of their partners. If Mr. Goodman wished to bring an as-applied challenge to that statute, he had the opportunity either to make a record before the director of state police or to bring a separate action seeking to declare the statute unconstitutional. Didn't a trial court judge make a specific finding in this case that he didn't believe or he found that contrary to the intent of the legislature at least, that there was no semblance or indicia of threat of harm or anything like that? The circuit court did not make an explicit statement to that effect. From what he said, it looked like it kind of hadn't occurred to him. So at the time that we moved to intervene, the circuit court clearly recognized that it had done something in contravention of Section 8.2. And the court said over and over again, I wish I could fix it. I can't fix it. Is that my time? Your summary is then your position. We've asked you a lot of questions. Can you give us a specific summary then of what your position is? Your Honor, this is the General Assembly has created a harmonious body of law that works in concert. And the statutes must be read together. And it is also my position that any second amendment challenge is not properly brought before this court. It was waived. There's no evidentiary record, and that in any event, what Heller is going to teach us is that it is appropriate to have narrow classes of disqualifications. It's the sweeping. For example, the Illinois Supreme Court's logic in Mosley and Aguilar was, okay, you cannot have a sweeping comprehensive ban. But it upheld the disqualification based on each of those dependents' status as a minor. So narrow classes of disqualifications has constitutional muster. Sweeping bans do not. Thank you. You'll have an opportunity to make rebuttal. Thank you. Mr. Grund? Thank you. You may proceed. Thank you. Good morning. May it please the court. My time is short. Therefore, I'm going to, with the court's permission, simply read probably the most important piece of evidence that permeates throughout the whole case, most of the case. And that is the mother's affidavit that was written in 2009. And if I may, she said, Drew spent almost 20 years of his life working extremely hard, along with my husband, before he became very sick, to make DDG Incorporated and its subsidiaries a successful business, and I want him to be rewarded for his efforts and keep working hard to make sure that the business continues to succeed. Whereupon, the trial court volunteered, saying, this undermines Drew's entire argument and supports the wife's position that such services were obtained by Drew as compensation for his efforts, or he paid for this stock with the future earnings that this company generated. Well, that was his position at one time. But to be candid, the trial judge sort of vacillated back and forth. Didn't he end up reversing himself and going full circle on this thing? Well, I don't know that he ever reversed himself from that position because it was never spoken of again. I'm talking in terms of the ultimate decision as to whether or not it was marital property. He went back and forth on that issue. Ultimately, he ruled against the wife, correct, on that issue? Yes, but not on the issue of whether. In other words, the trial court did not take into account this particular affidavit after the court made that pronouncement initially in the motion for summary judgment. Right. And so, in fact, there's no mention of the mom's affidavit in the entire judgment. Well, do we review the results to which the trial court arrived, or would we break it down on whether or not it all the arguably best component parts? I mean, we review the ultimate decision, don't we? I'm sorry. I didn't catch the question. Let me put it this way. We, as the appellate court, can affirm on any basis, irrespective of whether or not the trial court's reasoning was correct. You recognize that? Yes. No, I'm aware of that. But there is no basis by which the court could sustain the decision it made, because basically, while the court cited the burden of proof, clear and convincing evidence, it did not apply that burden, nor was there any evidence which would lead, and I mean any, which would lead the court to the ultimate conclusion. So it was against the manifest weight of the evidence. There was no evidence to support that this was non-marital property? No evidence at all? There was no support at all. In terms of the retained earnings argument, there was no. And in terms of the motion for summary judgment, well, we were barred from presenting any evidence at all that, in fact, 10 of these companies, but for one DDG, the holding company, were all acquired during the marriage. Therefore, the… By whom? I'm sorry? By whom were they acquired during the marriage? Well, they were acquired by DDG, which was a holding company, but acquired during the marriage nonetheless, and therefore… And what interest did Drew have in DDG at the time those properties were acquired? DDG was a premarital asset. I don't know if you could call it an asset, but it was a holding company that held other companies. Kennedy and Perlmutter stand for the proposition that a non-marital asset that acquires separate and distinct other assets should be treated as presumptively marital assets, those companies that are acquired by that non-marital asset. And we argue that in our brief. So we are given the presumption that the assets that were acquired during the marriage by a non-marital asset should be overcome by clear and convincing evidence. There was absolutely no evidence in that respect at all. But clear and convincing evidence, you don't even reach that. Isn't part of the argument of necessity there are genuine issues of material fact that require these issues to be litigated? Isn't that your bottom line position? Absolutely. Absolutely without question. The only time that we discuss marital assets would be in the context of the ability to argue that in trial and to present evidence of that issue, and we were foreclosed from doing that. We presume in our retained earnings argument that the company is non-marital, but the retained earnings itself is marital if it meets certain criteria. And in fact, Second District is famous for distilling the law on retained earnings arguments with Justice Burkett in Dan and in Steele, and then you have Joint and Lundell as the other seminal cases. So we've got two different issues in that regard. Your client, was your client ever in fear of her life or bodily safety relative to her petition for order of protection? The answer is yes. In what way? At one time, she didn't know who was surveilling her. At one time when she spotted the private detective and tried to stop him, it appeared that he would run her over. And she always noticed that there was somebody parked outside her home or elsewhere. So, yes. Let me ask you another question that I'll be asking opposing counsel. Does she need to be in fear of her life under the statutory provision in question that talks about harassment and other? No.  It's not a requirement at all, in fact. And many things, harassment is not a situation where one must be in fear of any bodily harm. What's your definition of harassment? Harassment is defined in the domestic violence statute. And it is, now I forget, but it certainly is a situation when you've got a constant, it's, you know, let me say it this way. Stalking. You know, it's not just a matter of harassing. When you spend as much money and you're being tracked for a period of three and a half years, 24-7, that's stalking. Let me just briefly ask you this, another question to counterbalance it. I'm sure his position is going to be they have a right to determine whether or not she's cohabitating with somebody. Generally speaking, correct? They have a right to determine? Determine if the wife is cohabitating with somebody else. Sure. So they're going to say, well, they were doing this for a legitimate purpose. They were trying to figure that out. So how do you respond to that? Well, and that's a good question. And, Justice Hudson, you mentioned you have to have a reasonable belief. But soon, as the case persists. But how do you get to a reasonable belief without investigating? Well, but the point is that they didn't investigate even to form a reasonable belief. Because they knew early on that the boyfriend had a separate home. They knew early on that he wasn't spending overnights when the children were around or he wasn't living there. In fact, Judge Salve dismissed the notion that they even attempted to do this on the basis of cohabitation as a reason. Because they introduced that evidence at trial. They still maintained that she cohabited at trial. But generated absolutely no evidence. Even with the evidence that they had over a course of three and a half years. It was only after a period of three years when they hired another detective and we were closer to trial. Did they attempt to advance that theory? Well, cutting to the chase, I think we've learned two things. First of all, the subject of the alleged victim does not have to be in fear of physical safety of their life. That's correct. To support an order. However, it would be a legitimate legal right to surveil to a certain extent to determine cohabitation. So I think it's going to come down to whether or not the surveillance could become so excessive and so intrusive that it would qualify for an order under the Act. Isn't that the bottom line? That's the bottom line. And the Act says so. If you're allowed to surveil, but if it's not for the intended purpose or it's designed for any other purpose but the intended purpose, then it's not permissible. Thank you. You will have an opportunity to make rebuttal. Thank you very much. Mr. DiDomenico, you may proceed. Justice McClaren, and may it please the Court, again, Michael DiDomenico for Drew Goodman, who joins us in court this morning. There's a lot to go over. I will go in whatever order you wish. Otherwise, I was going to start with Mr. Grun's arguments relative to summary judgment. As I understand it from the brief and his arguments this morning, he's pointing to Eileen Goodman, Drew's mother's affidavit, as being effectively a material fact that should have precluded summary judgment. I think that that's his position. The issue here is materiality. The mother's affidavit is not a material fact that would preclude summary judgment. Was she his employee in any event? No. All of the CXG Trust, which is the owner of the majority of these business interests, was created pursuant to an estate plan created by Drew's parents, a spendthrift trust for tax planning purposes and for the protection of Drew's father's grandchildren, Drew's children. The assets were appointed into the trust by Drew's mother pursuant to her power of appointments in the estate plan to do so. That one day, as she signed an affidavit in conjunction with her other son's divorce that attributed a reason, a subjective, vague reason why she exercised her valid power of appointment, is simply not material to the fact that she appointed those assets to the CXG Trust pursuant to her powers of appointments. So you're saying if this was part of an overarching plan, overarching attempt to engage in estate planning, what develops later shouldn't undermine that original intent. That's precisely what I'm saying, Justice Hudson. As I understand it from counsel's argument, that is what they're pointing to as far as material facts to upset the ultimate summary judgment determination. That just is not material. Why Drew's mother may or may not have done an exercise for powers of appointment isn't relevant. Let me ask you a point of question, Mr. Venable, because counsel is making an argument that probably has some superficial appeal. Didn't the trial judge go back and forth on this very issue several times? He did. Well, he reversed himself. He ran a summary judgment finding that the property was non-material to begin with. He was effectively convinced by counsel because of a separate transaction regarding an entity called Bulnett, which I think gave the judge pause and said, why don't we let this play out at trial, allow counsel to do some more discovery. My side came forward with a supplemental affidavit of one of the trustees, a supplemental affidavit that explained the Bulnett transaction, that the Bulnett entity was an empty shell that held nothing, that title to it was mistakenly put in Drew Goodman's name personally, but then when that mistake was fixed, it was all corrected before the asset took any assets or before it was conveyed to the trust. And when that was explained to Judge Salve by way of Mr. Blumenthal's supplemental affidavit, which was not rebutted in any way by the other side of this case, Judge Salve then reversed himself. What about the argument, then we can move on, that if the trial judge himself is going back and forth on this issue, doesn't that imply that there are issues of material fact? No, it doesn't. What it implies is that the judge had pause because of the Bulnett transaction, that counsel was successful in sowing confusion in his mind. That was then remedied and explained to the judge by way of the supplemental affidavit, which again was unrebutted. So the ultimate conclusion, I think, Judge Salve was quite comfortable with, and because he reversed himself once, I don't think that that implies the existence of any material fact. On the retained earnings issue, counsel did not spend much time on it. I'm not going to devote a whole lot of time on it. It's a manifest weight review. Which means an opposite conclusion would have to be clearly apparent. And there is no evidence on the other side at all. Retained earnings classically from this court, the cases talk about subchapter S corporations that are owned by the spouse and controlled by the spouse. Here, the entities in question are owned by a spendthrift trust, by the CXC trust, which undisputedly have spendthrift provisions that prevent Mr. Goodman from taking distributions. Those distributions are at the whim of some independent trustees. Was he also prohibited from voting on it as well? I understand that. On his own distributions, he has to abstain, and that's in the provisions. So the element of control, there's clearly no control from Drew Goodman. The assets are not even technically part of the marital estate. The other element of the retained earnings case is reasonable compensation, was for whatever Mr. Goodman was doing or does for these entities, which the evidence suggests is very little as far as actual day-to-day controls. He has no role in the day-to-day operations or really anything to do with these companies other than effectively a minor role. But we had a compensation expert who testified that what he did do, he was adequately compensated for total income distributions, dividends, salary, et cetera, over the course of the marriage, almost $31 million. That evidence, that expert testimony was credited by Judge Selvey. There was no contrary evidence. So on manifest weight review, this is a non-starter. The other argument in the brief that counsel didn't address was the maintenance and gross. Again, this is an abuse of discretion review. The suggestion here is that the judge abuses discretion by awarding Ms. Goodman $65,000 a month in permanent maintenance instead of ordering a $29 million maintenance and gross payment. There's no case that suggests that that constitutes an abuse of discretion. We make a threshold argument that maintenance and gross isn't even an available remedy anymore because it was deleted explicitly in the 2016 rewrite. Maybe it was the 2015 rewrite. And that argument has some intuitive appeal. But is there any case law that has specifically confirmed that legislative intent? Not yet. You would be the first to weigh in on that. But we're ñ excuse me, the amendment struck out maintenance and gross. There hasn't been since that occurred. I don't believe there's a panel that has addressed the issue. We could weigh in, but we would not necessarily, given the issues in the case, have to address it. We could find that there was no abuse of discretion. You could skip the statutory argument and just say it's not an abuse of discretion to award periodic permanent maintenance. Yeah, you realize we generally try to avoid constitutional issues and legal issues if we can. Which accounts for our first argument to the AG, trying to avoid a constitutional issue. On the cross appeal, I'll talk about the order of protection first. I think Justice Hudson, Your Honor, hit it on the head as far as can this rise to the level of harassment. Can there be ñ if we assume surveillance in this context to gather evidence of cohabitation, is there some line? And how do we define that line and was it crossed here? I think the circuit court gave meaning to the line by saying, by concluding there was too much money spent on it and it went on for too long. Was the money really an issue? I think he was quite taken back. I don't think that that's the issue. I think that the line has to do with whether an illegal act was committed. And you recognize him, which is gratifying. I mean, it could rise. If somebody's looking in your windows 24 hours a day, not saying it happened here, that would be excessive and would qualify. I would agree with that 100%. If they were getting in her face paparazzi style, Hollywood paparazzi style, if they were peering in her window, if they were going through her stuff, if they were doing illegal acts, I think we've got a problem on my side. Does peering in a window mean that you're doing it while trespassing on her property? Or does it mean that you're doing it with a telescopic device and you're off premises? What exactly do you mean when you say peering through a window? Because it's possible to peer through someone's window from a mile away. I suppose that's accurate. That did not occur here. That wasn't in the record. That wasn't part of the evidence that came out. Well, I thought the record indicated that the surveillors never trespassed on her property. Correct. That's correct, Your Honor. Why am I bringing this up instead of you? Because you can. Yes, Your Honor. There wasn't any evidence of high-range cameras or photos or anything like that. You said there wasn't any paparazzi. Right. When I'm talking about the level of intrusiveness, like in your face, getting in your face, I think if you were invading somebody's privacy. How many instances of surveilling was actually the spouse aware of? None. That was the evidence. There might have been one or two. Well, what about the time that she supposedly, or Mr. Kornick, saw the flash? There was the one instance of the camera flash. I misspoke, Your Honor. But other than that, she was effectively unaware that any of this was going on until discovery came out and all the bills came out to see how much money was paid. But other than that, and I think that that itself speaks to how this wasn't harassing. She didn't even know what was going on. And truly, I think that gathering evidence of cohabitation, especially in light of In re Marriage of Miller from this jurisdiction, is a legitimate purpose. And if you have a legitimate purpose, you don't meet the definition of harassment under the Domestic Violence Act. What's the standard of review of the propriety of the trial court's entering of the order? Is there a manifest way pursuant to best versus best? The evidence, and there simply was no evidence. The only evidence was the camera flash incident and her subjectively saying that all of this made her feel... She couldn't sleep. Couldn't sleep. But not when it was going on, though. It was all learned after the fact, at which point it had already stopped because prior to trial it had stopped. But I want to go back to the inquiry being, is this a reasonable purpose? Because emotional distress, you don't get there if this has a legitimate purpose. And gathering evidence of cohabitation is a legitimate purpose. When does it stop being legitimate? At what point in time or efforts does it stop being a legitimate purpose? If it's... I think that if it's clearly not producing any relevant information or allowing you to... Or leading to some place where you can go take... Strike that. Start over. Go ahead. If it leads you to somewhere where you can ask more questions. For instance, they learned what subpoenas or what Las Vegas casinos to subpoena, okay? In this case, by way of the private investigators. If it's leading to something or if it's leading you to a path to obtain information, I think the purpose is still legitimate. If it's becoming just keeping tabs on her or keeping tabs on somebody without... And it's not having the purpose of gathering evidence of cohabitation as Your Honor explained it. You're asking us to somewhat fashion a remedy here. And so what I'm asking you for is what are the factors? What should we be looking at when it's... Let's say on day one, it's a legitimate purpose. Week one. Month one. Six months. But at some point, it stops being a legitimate purpose. I mean, there's always something else out there, some other piece of evidence that you can find. But at what point does the balance begin to tip the other way? And did you cross it? Because I'm thinking that's the way the trial judge looked at it. You went too far. Right. The surveillance in this case stopped before trial. We thought we were going to trial. The trial got delayed. It stopped, okay? When does it become too much, right? Look, we had our 510C trial. The judge held against us. If this relationship continues and goes on and we have information that we think we can prove this again, if we get enough information, I think you're justified in reinstituting the surveillance. Cohabitation will always be an option here, right? He has indefinite maintenance, and he has the right under 510C to terminate it whenever he can prove it. Well, in terms of the order of protection, how long does the surveillance go on? It's like several years? Yes. And you alluded to one of the legitimate considerations might be whether or not it's producing results. So what specific results did this produce after three years? There was the information about the Las Vegas. Other than the Las Vegas. Excuse me. This is on page 56 and 57 of our brief. Las Vegas, there was another trip to California. There was the lease that was signed that identified Mr. Kornick and Ms. Goodman as residents and as engaged. I'm sorry, that was the vehicle, the truck purchase. Mr. Minico, you do a lot of divorce work. Let me ask you a blunt question. If the trip was taken by the couple to Las Vegas, would that in and of itself establish the elements of cohabitation? No, of course not. One trip isn't dispositive of anything, but this is just gathering evidence. It's gathering pieces to try to make your case. You've got a very difficult burden in this jurisdiction to prove cohabitation. Everyone in this room knows that. I've never done a 510C case that doesn't have some element of surveillance in it. I can't do it otherwise. So I understand the concern. But what I kind of hear you saying is, look, even after this case is all done and said, you can still always come back on cohabitation. So basically what you're telling me is as long as you have an inkling that maybe there's cohabitation going on, I can surveil my ex-spouse. If it's being held out to the degree that it's being held out here, yes, that's what I'm saying. Because you have a right to gather evidence to prosecute your claim. And as long as you do it within lawful means and do not violate the Domestic Violence Act, I don't see why that is not something that every maintenance payor can engage in if they can. Okay. Did you ever object to the limitations that were placed upon your client relative to no contact whatsoever or don't do it as opposed to stay at least 50 feet from her at all times? Did we object to that? My point is that if you're surveilling her and you talked about paparazzi, paparazzi are usually close enough that they can get punched in the nose. And if you're surveilling and you are not within 50 feet of this individual, then are you doing something that a reasonable person might consider to be harassment? In other words, surveillance can be close. It can be inside someone's immediate presence. It can be outside the presence. It can be within their presence but far enough away that they don't see you because you're behind a tree or behind three trees. What did the trial court do insofar as the limitations that were placed upon your client? Were they no contact, no surveillance whatsoever, or was it try and stay far enough away that you're not in her face? I believe the order was just strictly surveillance in an undefined way without a feet limitation, without any sort of teeth or meaning or definition of what was meant by surveillance. I think the order just says humanizations are barred from surveillance, period. I suppose it would be up to later court's determination of what surveillance means in the order. Did you raise an issue about one-tenth of one percent? Right. So the trial court's judgment on this issue conflicts. So there was a finding that Drew's mother gifted it, and there was no contrary evidence to that effect. But then he put it in the marital pot, so to say, and calculated it and put it in the marital estate and distributed it 70-30 in the way he did. So he added the 0.01 percent interest as a personal asset of Drew's and counted it as marital. Prior to the judgment, he found it was valid. What value did he place on it? I think it's about $100,000, whatever 0.01 percent of the valuation of the trust was. So in the cross-appeal, we're simply asking that the judgment be amended to clarify that the 0.01 percent is Drew's non-marital property. We're not looking to reassess or redistribute the property in effects she can keep the money, so to say. They've been arguing that the assets of the trust are marital property. Was there any other evidence in the record of commingling or anything like that that was transmuted? Nothing. No commingling. They're hanging their head on the affidavit of his mother? Yeah. They're trying to make a commingling argument, I think, or that Drew Goodman contributed personally to this trust. There's no evidence of that at all. Nothing. If you're not seeking a re-evaluation or reassessment or redistribution and it was this 0.01 percent was given to your client, what relief would we be granting you other than a hypothetical that I don't see the significance of? Does it have something to do with taxes or estate planning? Or what is it that we supposedly, by granting your request, would actually be affecting something? And when I say affecting, I mean with an E. I suppose potentially if there's a creditor out there, there's a judicial declaration that Drew Goodman personally owns 0.01 percent as marital property as opposed to it being gifted. This is more in the nature of correcting the judgments, okay? Just keeping the judgment consistent that Drew Goodman, you know, was gifted this pursuant by his mother as opposed to acquiring it in some other way, which is what the other side is saying. Oh, it has some collateral consequences. The creditors might try and attach something along those lines. Correct. And that's the only reason. Again, we don't seek any sort of monetary… Are we working? No. Thank you. You will have the opportunity to make rebuttal. Ms. Quinn? Very well. Thank you. Mr. Grund? Thank you. It strikes me that the same argument that's been made throughout this case, and even in the appellate stage, they have the tenacity to argue that this affidavit is immaterial. But they don't say why it's immaterial when it is absolutely, probably the most important piece of evidence that drives this entire case. And while Judge Salve may have been wrong on the law, he's a good jurist. He gave us a great trial. He's smart. And when he says something like, Well, part of my concern is, and you, referring to Drew's counsel, can address this in the underlying point in your motion, is that this was some type of an estate planning mechanism. And let me read you something from Eileen Goodman, which implies the complete opposite. Among the reasons that I've decided to make these changes is because my son Drew has spent almost 20 years of his life working extremely hard along with my husband before he became very sick. I want him to be rewarded. I want him to be rewarded, speaking of Drew Goodman, for his efforts and to keep working hard to make sure that this business continues to succeed. And then the judge said, That implies this whole arrangement is to compensate Drew. If you're going to compensate Drew by giving him the stock, and what is unknown is the fact that, at this point, was the fact that his mother was paid $800,000 a year to this very moment, I imagine, at least through the time of the judgment. When she did no work, she did nothing but visit the company twice a week for a couple of hours when she wasn't in Florida. How does one realistically draw any other conclusion but the same conclusion that Judge Salvey drew in saying this whole idea that this was an estate plan sort of is undermined by model? Let me ask a very pointed question. It may be a difficult question to answer. What about if this was said, it was started out to be part of an estate planning, but then, because of his efforts in the business, it had sort of a dual purpose. Does that necessarily mean it has to be marital property? Well, it does, because under Dan, based upon the evolution of the law on retained earnings, the retained earnings are marital despite the fact that the underlying asset is non-marital. And that's what this whole area of law is about. How long before the marriage was this business set up? It was years before, was it not? Which business, Judge? The trust, the original, started the evolution of the business. Okay, so you had a trust that was set up initially in 1990. The second trust, which is the most pertinent trust into which the assets were transferred is a trust that was set up in 2006, 10 years after the marriage and during the marriage. And then we question whether that is a true trust or not because it's not signed, it doesn't have the components of a real trust. Why do you think they called it an investment trust as opposed to a descendant's trust? And the original trust that was set up by Dad in 1990 required that any subsequent trust be named as a descendant's trust and provide for other certain things that it had to contain. But this trust didn't. And obviously, that's exactly what it does. To this point, this trust has $50 million which Drew hired his ex-banker to invest. Now, in reviewing the correctness of Judge Selva's decision on this point, what is our standard of review? Okay, the standard of review is abuse of discretion, without question. But, I'm sorry, but... Abuse of discretion is defined as in order to overturn his ruling, we would have to find that no reasonable person would agree with his decision. It's a pretty deferential standard, isn't it? It is, without question. But when something is against the manifest weight of the evidence, then that constitutes an abuse of discretion. And in this case, when it relates to any of these subjects, other than the motion for summary judgment, you have no evidence that had to be proven by clear and convincing standards. None. The only thing they talked about and feared in this entire trial was to show that Drew wasn't the boss, that he didn't have control. And I think the record is clear. I want to say something also, because I'd be remiss if I didn't bring up something here about this entire domestic violence issue. And again, this thing called an obsession by Judge Dalsey, he called it an obsession for several reasons. Drew Goodman was obsessed with surveilling his wife before the onset of divorce, before there was any hint of her having a boyfriend. He was... And that's what the evidence also showed. And the records that were brought into testimony into the... I'm sorry. The record of the investigator showed that they put tracking devices on her car. Her car. Now, why would you put tracking devices on her car so that they can... That's not a factor of cohabitation, if she's riding in a car with her boyfriend, but living with him in a conjugal way is. Why would you track her while she was going to... And follow her there? Was it an obsession? Absolutely it was an obsession. It isn't remotely close. The only reason that this case is before you is because, as Judge Selvey said, and it's part of this record too, I made a mistake. And I too made a mistake as a trial lawyer, because I was busy doing something else when that order was entered. And it didn't dawn on me. So we tried to correct that when we went to Judge Selvey arguing that he didn't have any jurisdiction over this matter to correct the record. And I offered to stipulate that the court made a mistake and revest jurisdiction and have the court correct itself. However, that was objected to by Drew Goodman. So what you have before you simply is this. A stalking of a wife that created, as she explained, she felt violated. And you have a mistake that was made by a preeminent jurist that counsel for the husband failed to acknowledge and stipulate that it should be corrected and revest jurisdiction with the trial court. That's why this matter is up here. It wouldn't have been up here otherwise. With respect to the law on the Domestic Violence Act, that has never come up before. And there's plenty of good reason, including public policy, why guns should be taken away or the right to own guns and hold guns should be taken away from someone who violates the Domestic Violence Act. It's there to protect many, many spouses who have been abused generally by the other spouse. Thank you very much. Thank you. Mr. D. Domenico, you may proceed. Again, the evidence that you were plenary hearing on the order of protection was that she wasn't even aware. Speak up a little louder. She wasn't even aware that the surveillance was going on. The fear is a post hoc rationalization or conceptualization of whatever was going on. But I think that the fact that she didn't know what was going on speaks to the lawfulness of it, speaks to the fact that it wasn't intrusive at the time. It didn't cross any lines of illegality. Don't forget, the people that were hired to do this are licensed in their own regard. The one who testifies, former FBI, licensed private investigator, these people have their own rules to comply with to stay licensed. The evidence at the trial was that the surveillance was cleared with local police ahead of time. They had no issue with it either. Is there a legal impediment to you ever going back before the trial court and trying to revisit this issue of the priority of the order of protection? Is there an impediment to us going back? Yes, did you do that? Well, we appealed to this court as far as vacating the order. Right. Well, we had a plenary hearing. We granted a plenary two-year order of protection. We filed our notice of appeal, and here we are. But could you go back to the trial court at some point? Well, the order is going to expire in September. So it would be on the petitioning party to try to re-up it. Right, because if the order was vacated, then that would take care of the department's issue because they would be responding to what the order is as counsel for the department itself. If there's no order entered, he gets his boycott. I would assume that the AG's arguments can be skipped by the panel if the order of protection is reversed because it's moved, right? The discussion is academic. My only other issue on cross-appeal was attorney's fees, which we really didn't talk about. Counsel didn't get a chance to address it. Your Honor, do you have any questions about any of the fee issues or anything else on my cross-appeal? Well, if there was some issue with that, you would probably end up having to be remanded if you got that far right. I mean, if there was an issue of whether or not the fees were improper. Actually, I disagree with that, Your Honor. We seek a straight reversal on the contribution order with no remand. We see it as explained in our briefs. We see it as a failure of proof. This Court is very clear as to what the attorney's obligations are from an evidentiary standpoint about what has to be proved, what you have to show to prove up reasonableness in this district. They didn't do that. In fact, not only did they not do what you told them to do in cane one, they did what you told them not to do in cane one. And the suggestion that that's harmless error or that they get a do-over after coming up on appeal and letting Mr. Ostro and I educate them about how to put on a 503-J contribution hearing, I don't see why a remand would be necessary. We see it as a failure of proof. We see it as a straight reversal. Thank you. Just remind me, if you would, how much money is in the kitty in totality? In the marital estate? No, in the entire proceedings. It was non-marital. I think for her it was around $244,000 or something like that, and him was, what, $187 million? I believe that the trial court fixed the value of the assets in the CXG Trust, $140 million, $150 million. The marital estate was a shade under $5 million, of which she got about 70%. Okay. Thank you, guys. Thank you. We'll take the case under advisement. There will be a short recess. We have other cases on the call.